# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

MARK HENDRIKS, Individually And On Behalf Of All Others Similarly Situated,

        Plaintiff,

    v.

PHARMACEUTICAL PRODUCT DEVELOPMENT, INC., FREDRIC ESHELMAN, RAYMOND HILL, ERNEST MARIO, STUART BONDURANT, FREDERICK FRANK, TERRY MAGNUSON, VAUGHN D. BRYSON, ROBERT ALEXANDER INGRAM, RALPH SNYDERMAN, JAGUAR HOLDINGS, LLC, THE CARLYLE GROUP, HELLMAN & FRIEDMAN LLC, and JAGUAR MERGER SUB, INC.,

        Defendants.

**Case No. 11-CV-176**

**AMENDED SHAREHOLDER CLASS ACTION COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES AND INDIVIDUAL CLAIMS FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

JURY TRIAL DEMANDED

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, Mark Hendriks ("Plaintiff") by his attorneys, for his amended complaint against defendants, alleges upon personal knowledge as to himself, and upon information and belief as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.    This is both an individual action and a shareholder class action brought on behalf of the holders of the common stock of Pharmaceutical Product Development, Inc. ("PPDI" or the "Company") to enjoin the acquisition of the publicly-owned shares of PPDI common stock by Jaguar Holdings, LLC ("Jaguar"), an affiliate of The Carlyle Group ("Carlyle") and Hellman & Friedman LLC ("H&F"), and its wholly-owned subsidiary, Jaguar Merger Sub, Inc. ("Merger Sub") (Jaguar Holdings, LLC, The Carlyle Group, Hellman & Friedman LLC, and Jaguar

Merger Sub, Inc. are collectively referred to herein as "the Buyout Group") as detailed herein (the "Proposed Transaction").

2.      On October 3, 2011, PPDI publicly disclosed that they had entered into a definitive merger agreement (the "Merger Agreement"), under which it will be acquired by affiliates of The Carlyle Group and Hellman & Friedman in an all-cash transaction valued at $3.79 billion, after which PPDI will be a private company.  Under the terms of the Merger Agreement, The Carlyle Group and Hellman & Friedman will acquire the outstanding common shares of PPDI for $33.25 per share in cash.  The Proposed Transaction is unfair both with respect to price and process and is designed to benefit PPDI's insiders to the detriment of Plaintiff and the Class (defined herein).

3.      As described below, the Proposed Transaction is the product of a flawed process that was designed to sell PPDI to the Buyout Group on terms detrimental to Plaintiff and the other public shareholders of PPDI, and unreasonably favorable to certain Individual Defendants (defined below).  In pursuing the plan to induce PPDI shareholders to approve the Proposed Transaction, each of the defendants violated applicable state law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, diligence, good faith and fair dealing, independence, and candor.

4.      As disclosed in the Schedule 14A Preliminary Proxy Statement filed with the Securities and Exchange Commission on October 14, 2011 (the "Proxy"), the Board instructed Morgan Stanley & Co. LLC, one of the Company's financial advisor's hired for the transaction, to identify and contact *only* potential acquisition partners meeting strict threshold criteria set by the Board, including (i) private equity firms that were large enough to finance a transaction with the Company, (ii) which had previously expressed an interest in the Company, or (iii) had

experience in the contract research organization ("CRO") sector and did not control competitive companies. Over the next three-and-a-half months, Morgan Stanley and the Company discussed various acquisition possibilities with financial partners (mostly private equity firms), including both firms comprising the Buyout Group. However, because the Board had set such unreasonably strict threshold criteria to even sit at the negotiation table, the Company and its banker turned away many interested parties, which artificially narrowed the scope of potential partners. Finally, on October 2, 2011, the Board and its financial advisors approved the $33.25 offer from the Buyout Group.

5.      However, the Proxy does not indicate whether the Board undertook any actions to investigate or protect the sales process against any conflicts of interest that stemmed from Morgan Stanley's close professional relationship with Carlyle, or whether the Board even considered the possibility that any conflicts even existed. Similarly, the Proxy does not disclose the nature of Morgan Stanley's compensation structure for the services performed for the Company. Without knowing the nature and scale of Morgan Stanley's interests, or even the manner in which Morgan Stanley was compensated, Plaintiff cannot form a judgment as to whether the analyses and advice rendered by Morgan Stanley to the Company in connection with the Proposed Transaction might have been manipulated by Morgan Stanley to suit its own financial interests.

6.      Indeed, the Proxy omits and/or misstates material information about both the sales process and key points regarding both Morgan Stanley and Lazard's financial analyses that were relied upon by the Board in recommending the Proposed Transaction. Because of these omissions and misstatements, Plaintiff cannot make a fully informed decision as to whether to vote his shares in favor of the Proposed Transaction.

7. Since this information is material to PPDI public shareholders' upcoming voting decision, Defendants' (defined below) conduct constitutes violations of §§14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"). Additionally, the Individual Defendants' conduct constitutes a breach of their fiduciary duties owed to PPDI's shareholders and a violation of applicable legal standards governing the Individual Defendants' conduct.

8. Therefore, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including seeking shareholder approval of the Proposed Transaction, until they comply with their applicable fiduciary duties and federal obligations under §§14(a) and 20(a) of the Exchange Act and provide shareholders with all material information necessary to make the statements contained in the Proxy not false and misleading and allow shareholders to make a fully informed decision.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C §1331 in that Plaintiff's claims arise in part under the Constitution and laws of the United States, including the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

10. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because one or more of the defendants, including PPDI either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, occurred in substantial part in this District. Finally, the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.     Plaintiff, Mark Hendriks is and was, at all times relevant hereto, a holder of PPDI common stock.  Plaintiff is a citizen of California.

12.     PPDI is a North Carolina corporation headquartered at 929 North Front Street, Wilmington, NC 28401.  The Company's primary businesses are drug discovery, development, and lifecycle management services.  PPDI common stock is traded on the NASDAQ Stock Exchange under the symbol "PPDI."  PPDI is a citizen of North Carolina.

13.     Defendant Fredric Eshelman ("Eshelman") has been a director of PPDI since 1993, Chief Executive Officer of the Company since 1993, and Chairman since 2009. Eshelman owns 7.4 million shares of PPDI common stock.  Eshelman is a citizen of North Carolina and resides at 6799 Towles Road, Wilmington NC 28409.

14.     Defendant Raymond Hill ("Hill") has been a director of PPDI since September, 2011.  Hill owns 30,000 shares of PPDI common stock.  Hill is a citizen of New Jersey and resides at 5 W Shore Drive, Pennington NJ 08534.

15.     Defendant Ernest Mario ("Mario") has been a director of PPDI since 1993 and served as the chairman of the Board from 1993 to 2009.  Mario owns almost half a million shares of PPDI common stock.  Mario is a citizen of Pennsylvania and resides at 350 S River Rd., Apt. A8, New Hope, PA 18938.

16.     Defendant Stuart Bondurant ("Bondurant") has been a director of PPDI since 1994.  Bondurant owns 21,479 shares of PPDI common stock.  Bondurant is a citizen of North Carolina and resides at 209 Cedar Berry Lane, Chapel Hill, NC 27517.

17.     Defendant Frederick Frank ("Frank") has been a director of PPDI since 1996. Frank owns 72,565 shares of PPDI common stock. Frank is a citizen of New York and resides at 109 E 91st Street, New York, NY 10128.

18.     Defendant Terry Magnuson ("Magnuson") has been a director of PPDI since 2001. Magnuson owns 17,633 shares of PPDI common stock. Magnuson is a citizen of North Carolina and resides at 408 Mayberry Drive, Chapel Hill NC 27514.

19.     Defendant Vaughn D. Bryson ("Bryson") has been a director of PPDI since May, 2011. Bryson owns 1,139 shares of PPDI common stock. Bryson is a citizen of Florida and resides at 719 Grove Pl, Vero Beach, FL 32963.

20.     Defendant Robert Alexander Ingram ("Ingram") has been a director of PPDI since May, 2011. Ingram owns 1,139 shares of PPDI common stock. Ingram is a citizen of North Carolina and resides at 3624 Dover Road, Durham, NC 27707.

21.     Defendant Ralph Snyderman ("Snyderman") has been a director of PPDI since March, 2011. Snyderman owns 1,139 shares of PPDI common stock. Snyderman is a citizen of North Carolina and resides at 5800 Ten Springs Lane, Durham NC 27705.

22.     Defendants Fredric Eshelman, Raymond Hill, Ernest Mario, Stuart Bondurant, Frederick Frank, Terry Magnuson, Vaughn D. Bryson, Robert Alexander Ingram, and Ralph Snyderman are referred to herein collectively as the "Individual Defendants" or the "Board."

23.     Defendant, The Carlyle Group, a global alternative asset manager, is a Delaware corporation headquartered at 1001 Pennsylvania Avenue NW Suite 220 South Washington, DC 20004.

24.     Defendant, Hellman & Friedman LLC, a leading private equity investment firm with offices in San Francisco, New York and London, is headquartered at 1 Maritime Plaza San Francisco, CA 94111.

25.     Defendant Jaguar is a Delaware limited liability company ("Parent").  Jaguar is an affiliate of The Carlyle Group and Hellman & Friedman LLC.

26.     Merger Sub is a wholly-owned subsidiary of Parent and is a North Carolina corporation.

27.     Defendants, the Buyout Group, are named herein as aiders and abettors to the breaches of fiduciary duty described herein.

28.     The Individual Defendants and the Buyout Group are sometimes collectively referred to herein as "Defendants."

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

29.     By reason of the above Individual Defendants' positions with the Company as directors and/or officers, said individuals are in a fiduciary relationship with Plaintiff and the other public stockholders of PPDI who are being and will be harmed by the defendants' actions described herein (the "Class") and owe Plaintiff and the other members of the Class a duty of highest good faith, fair dealing, loyalty and full and adequate disclosure.

30.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the applicable state law requires the directors to take all steps reasonably required to maximize

the value shareholders will receive rather than use a change of control to benefit themselves. To diligently comply with this duty, the directors of a corporation may not take any action that:

(a) adversely affects the value provided to the corporation's shareholders;

(b) contractually prohibits them from complying with or carrying out their fiduciary duties;

(c) discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

(d) will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders.

31. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of PPDI, are obligated under applicable law to refrain from:

(a) participating in any transaction where the directors' or officers' loyalties are divided;

(b) participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c) unjustly enriching themselves at the expense or to the detriment of the public shareholders.

32. The Individual Defendants are also obliged to honor their duty of candor to PPDI's shareholders by, *inter alia*, providing all material information to the shareholders regarding a scenario in which they are asked to vote or tender their shares. This duty of candor ensures that shareholders have all information that will enable them to make informed, rational

and intelligent decisions about whether to relinquish their shares in exchange for the consideration offered.

33.     Plaintiff alleges herein that Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiff and other public shareholders of PPDI.  Certain of the Individual Defendants stand on both sides of the transaction, are engaging in self dealing, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by Plaintiff or the Class.  As a result of the Individual Defendants' self dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their PPDI common stock in the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action pursuant to Rule 23 on behalf of himself and all other shareholders of the Company (except the defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest), who are, or will be, threatened with injury arising from defendants' actions, as more fully described herein.

35.     This action is properly maintained as a class action under Rules 23(b) (1) and 23(b) (2) of the Federal Rules of Civil Procedure.

36.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of July 27, 2011, there were over 113 million shares of PPDI common stock issued and outstanding, likely owned by thousands of shareholders.

(b)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(c)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially members or impede their ability to protect their interests.

(d)     To the extent defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because defendants have acted, or refused to act, on grounds generally applicable to the Class.

37.     There are questions of law and fact that are common to the Class including, *inter alia*, the following:

(a)     whether the Individual Defendants have breached their fiduciary duties of due care, good faith, and loyalty with respect to Plaintiff and the other members of the Class in connection with the conduct alleged herein;

(b)     whether the process implemented and set forth by the Individual Defendants in connection with the Proposed Transaction was fair to the members of the Class;

(c)     whether the Individual Defendants have breached their fiduciary duty of candor by failing to disclose all material facts relating to the Proposed Transaction; and

(d)     whether Plaintiff and the other members of the Class would be irreparably harmed if defendants are not enjoined from effectuating the transaction described herein.

38.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

39.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### A.     PPDI Is Poised For Growth

40.     PPDI is a leading contract research organization ("CRO") providing outsourced pharmaceutical research, clinical services, drug discovery and development services to pharmaceutical and biotechnology companies.  CROs such as PPDI provide pharmaceutical and biotechnology companies, universities and government organizations with drug-development and medical-device research services. Such companies help clients design and implement multiple phases of clinical trials, from recruiting volunteers and conducting laboratory tests to monitoring clinical data and safety standards.  PPDI also assists drug makers with preclinical services such as compound testing and discovery.  Burdened by more complex and costly research and development, drug makers have in recent decades begun outsourcing some of these activities in an effort to maintain their own profit margins.  The contract-research industry has benefited from this shift, but the earnings of many of the companies were hurt during the

recession as big health-care companies reduced research spending. Companies like PPDI suffered in 2008-2009 due to a decline in demand for their services during a depressed economy.

41. However, the environment for CROs is gradually improving. The improving request for proposals ("RFP") flows and key strategic partnerships secured by PPDI with bio-pharmaceutical customers are a testament to such a revival, which could in turn result in bottom-line growth. In fact, many in the CRO industry believe it has turned a corner, as evidenced by resurgence in new business activity and revenue growth over the past few quarters. The second quarter marked the first period since the beginning of the drug-development slowdown that the industry saw widespread top-line growth. The emergence of the strategic partnership model, which has seen the world's largest drug makers pair up with leading CROs as long-term research and development partners, has helped fuel this return to growth in the industry.

42. For the first time since the beginning of the drug-development slowdown in 2009, the vast majority of the CROs in the market sector turned in top-line growth on both a sequential and year-over-year basis, and PPDI was one of the biggest top-line gainers during the second quarter of 2011. In particular, PPDI recorded net revenue of $407.7 million for the second quarter of 2011, an increase of 10.2% over net revenue of $369.9 million for the second quarter of 2010. Second quarter 2011 income from operations was $57.1 million, compared to $40.1 million for the second quarter of 2010. Income from operations for the second quarter of 2011 was higher than the same period last year due primarily to higher net revenue and a decrease in research and development and operating expenses due to the June 2010 spin-off of Furiex Pharmaceuticals, Inc. Diluted earnings per share for the second quarter of 2011 were $0.41, compared to $0.18 for the second quarter of 2010. Second quarter 2011 diluted earnings per

share included income of $10.6 million related to the Company's investment in Celtic Therapeutics and a $1.3 million loss on investments.

43.    Commenting on these second quarter 2011 results and the recent success the Company has experienced, Defendant Eshelman stated:

> Strong client demand for our services resulted in record high request for proposal levels, gross authorizations of $752.6 million, and a net book-to-bill ratio of 1.29 for the second quarter.  While cancellations were higher than we expected, we continued to deliver solid backlog growth of 14% and double-digit percentage net revenue growth year-over-year in the quarter. ***We intend to remain focused on high-quality operational execution and cost control to drive value for our clients and shareholders***.

44.    Additionally, the Company announced on September 21, 2011 that it had expanded its clinical microbiology laboratory at its global central laboratories worldwide, strengthening its laboratory testing services in infectious diseases, one of the largest therapeutic areas for clinical research and development.  This expansion allowed the strengthening of certain microbiology capabilities.

45.    However, rather than permitting the Company's shares to continue to trade freely and allowing its public shareholders to reap the benefits of the Company's strategic initiatives and CRO expansion which were already producing increasingly positive financial results and poised the Company for further improvements in the coming year, the Individual Defendants have acted for their own benefit and the benefit of the Buyout Group, and to the detriment of the Company's shareholders, by entering into the Merger Agreement.  The Individual Defendants effectively capped PPDI's price at a time when the Company's stock was overcoming the effects of the lingering economic recession and when it was poised to capitalize on its positive and encouraging financial outlook.

**B.    The Board's Flawed And Inadequate Auction Process**

46.     On June 28, 2011, the Board held a special telephonic meeting to review the business of the Company, the risks facing the industry, the current global economic environment, the outlook for the pharmaceutical industry and research and development spending, the Company's business plan, the Company's recent financial and operating performance and share price performance and its prospects for future growth and share price appreciation.  While disclosing absolutely nothing about the actual contents of those discussions or the particular risks/outlook facing the Company, the Proxy indicates that this meeting resulted in the Board's unanimous approval a two-to-four week exploratory process with potential acquisition partners meeting strict threshold criteria set by the Board, including (i) private equity firms that were large enough to finance a transaction with the Company, (ii) which had previously expressed an interest in the Company, or (iii) had experience in the contract research organization ("CRO") sector and did not control competitive companies.

47.     Following the direction of the Board, on July 1, 2011, the Company retained Morgan Stanley to act as its financial advisor, and to assist the Company in evaluating the exploratory process and its strategic plan.  As discussed below, however, the Proxy fails to disclose, let alone discuss, the nature of the fee arrangement for Morgan Stanley's services in connection with the Proposed Transaction, any potential conflicts of interest considered, or the past relationship, if any, the Company had working with Morgan Stanley.  The Company, directly or through Morgan Stanley, subsequently contacted four private equity firms that were identified as meeting the criteria established by the Board, including both Carlyle and H&F, to communicate a process for the potential submission of confidential preliminary indications of interest for an acquisition of 100% of the Company.  During the week of July 5, 2011, all of the contacted private equity firms signed non-disclosure agreements, and the Company gave Carlyle,

H&F and two other private equity firms (described herein as "Bidder C" and "Bidder D", respectively) access to limited Company confidential information. Bidder D later dropped out.

48.     On Sunday, July 17, 2011, *The Wall Street Journal* published an article online, indicating that the Company was exploring a potential sale, including a potential combination with a competitor. Following the publication of that article, six other potentially interested parties, including a competitor to the Company, a private equity firm owning a competitor to the Company, a private equity firm with prior experience in the CRO industry and three other private equity firms, contacted the Company regarding a possible business combination. However, only the private equity firm with sector experience was invited to participate in the auction process (hereinafter "Bidder E"), as it was the only additional interested party that met the board's artificially narrow search criteria. The other five parties were not invited to participate.

49.     On July 21, 2011, Morgan Stanley requested in writing that the four potential buyers (Carlyle, H&F, Bidder C and Bidder E) submit to the Company a preliminary, non-binding indication of interest on July 25, 2011, including a proposed per share purchase price. On July 25, 2011, Bidder C informed Morgan Stanley that it would not be submitting an indication of interest. H&F and Bidder E submitted indications of interest on July 25, 2011, and Carlyle submitted an indication of interest on July 26, 2011, proposing to acquire the Company at $37.25 per outstanding share of our common stock. The other indications of interest included a range of $33.00 to $36.00 per share from H&F, and a price per share of $36.00 from Bidder E.

50.     Representatives of Morgan Stanley and the Company negotiated with Carlyle over the next few days, and on July 31, 2011, Carlyle communicated that it would increase its July 26, 2011 indication of interest to $37.50 per share if the Company would agree to deal exclusively with Carlyle with respect to negotiation of any potential change of control

transaction. At this point, the Board agreed to proceed exclusively with Carlyle regarding a potential transaction, and directed management and Morgan Stanley to inform Carlyle that the Company would verbally agree in principle that for the subsequent four weeks it would negotiate only with Carlyle.

51. At the same Board meeting, the Board directed management to retain an **additional** investment bank or financial advisor to conduct analyses and render a fairness opinion as to the fairness of any merger consideration to be paid in any transaction. The Proxy does not adequately discuss why the Board was inclined to retain an additional financial advisor at this point in the negotiations. Eventually, the Board selected Lazard Freres & Co., LLC ("Lazard") to act as the additional advisor.

52. On August 2, 2011, the Board received another letter from the competitor of the Company that had contacted the Company after publication of the article in *The Wall Street Journal*, indicating an interest in acquiring the Company within a price range of $34.00 to $38.00 per share. However, once again at the direction of the Board, Morgan Stanley advised the competitor that it did not meet the criteria established for participation in the sale process, and turned the party away.

53. On August 29, 2011, representatives of Carlyle told representatives of the Company that Carlyle had arranged for its debt financing and was prepared to pay $34.00 per share, but needed until September 12, 2011 to arrange for a commitment from another potential equity partner, as one of Carlyle's equity partners was unable to act on the transaction in the short time frame available, although Carlyle later indicated that it could improve its offer, possibly to the level of $35.00 per share. In connection with its efforts to find a potential equity

partner in the transaction, Carlyle requested permission to contact H&F, which Carlyle believed had both the financial capability and interest in the CRO industry to be a suitable equity partner.

54.     On September 13, 2011, as directed by the Board, representatives of Morgan Stanley contacted Bidder E to determine if it would be interested in conducting due diligence that would support a joint proposal for the Company with Carlyle at a price per share of $35.00 or more.  On or about September 16, 2011, Bidder E contacted Morgan Stanley and indicated that it was not interested in submitting a ***joint proposal*** for the Company with Carlyle on the terms outlined by Morgan Stanley.  The Proxy does not disclose however, whether the Company considered a deal with Bidder E individually, or whether Bidder E had even proposed such a transaction.

55.     On the evening of September 26, 2011, representatives of the Buyout Group called Morgan Stanley and offered to pay $33.00 per share of PPDI common stock.  While the Board initially rejected this offer, they quickly capitulated to the Buyout Group's modestly increased offer of $33.25 on September 30, 2011, the same day the Buyout Group made the offer.  In the Proxy, the Board cited market conditions and the challenges facing the CRO industry, as well as CRO market valuations and the sensitivity of the Company's share price in a prolonged period of economic weakness and reduced research and development spending by pharmaceutical companies, as compelling reasons for accepting the reduced offer price.

56.     The parties executed the merger agreement on October 2, 2011, and on the morning of Monday, October 3, 2011, prior to the opening of the Nasdaq Stock Market, the Company issued a press release announcing that it had entered into the Merger Agreement.

C.    **The Proposed Transaction**

57.    On October 3, 2011, PPDI issued a press release announcing that it had entered into a definitive Merger Agreement pursuant to which the Buyout Group will acquire PPDI for $33.25 cash per share.  The press release for the Proposed Transaction touted what the purported "premium" represented over the market price of PPDI common stock, stating:

> Under the terms of the merger agreement, Carlyle and Hellman & Friedman will acquire the outstanding common shares of PPD for $33.25 per share in cash. This represents a premium of 29.6 percent over PPD's closing price on September 30, 2011.
>
> PPD's board of directors has unanimously approved the merger agreement and recommended that PPD's shareholders adopt the agreement. A special meeting of PPD's shareholders will be held following the filing of a definitive proxy statement with the U.S. Securities and Exchange Commission and subsequent mailing of the proxy statement to shareholders.
>
> "The sale of PPD to The Carlyle Group and Hellman & Friedman provides an attractive return for our shareholders, while also ensuring a secure foundation and commitment to investment, innovation and excellence for PPD clients and employees as the company builds on its 25-year history of success."

58.    The Proposed Transaction is unfair and undervalued.  The $33.25 per share agreed to in the Proposed Transaction is a woefully inadequate price, and defendants' rationale for asserting that the premium supports a fair price is unsound as PPDI stock has been trading at depressed levels and the Company is at the bottom of a cycle that is expected to improve as the economy emerges from the current recession.  Indeed, the "premium" touted by defendants is based on the price of PPDI common stock on September 30, 2011, that represented a relative low for the shares at $25.66 per share, versus a 52-week high of $33.07 per share.  A fair price cannot be based on a purported "premium" over a depressed market price and thus, the $33.25 price is unfair to shareholders.

59.     Furthermore, The Proposed Transaction is unfair and undervalued, since according to Bloomberg, several financial analysts following the Company had price targets in excess of the $33.25 consideration offered prior to the announcement of the Proposed Transaction.  For example, Jefferies and BB&T Capital Markets had a price targets for PPDI as high as $35 per share.  Similarly, Deutsche Bank Global Markets Research maintained a $34.60 per share price target.  In fact, even if one is to look before what might arguably be called a run up period, PPDI was trading at $31.46 as recently as April 26, 2011, and was poised to continue its recent growth.  However, the Individual Defendants agreed to sell the Company at a materially inferior price, to the detriment of the Plaintiff and the Class.

**D.     The Proposed Transaction Resulted From Crippling Conflicts of Interest**

60.     By reason of their positions with PPDI, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of PPDI.  Moreover, despite their duty to maximize shareholder value, certain Defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of PPDI's public shareholders

61.     Indeed, certain of the Individual Defendants will receive lavish compensation, benefits or change of control and severance benefits.  First, while no formal agreements for continued employment have been announced to date, the Merger Agreement mandates each Individual Defendant cash out any equity interests in the Company in the Proposed Transaction (as the Buyout Group will come to own 100% of the Company), creating immediate opportunities to turn otherwise illiquid blocks of PPDI common stock into cash.  The windfall payments resulting from the deal materially conflicts the Individual Defendants' ability to effectively protect the interests of PPDI shareholders.  As described below, these benefits

provided certain Individual Defendants with markedly separate incentives from the rest of PPDI's public shareholders.

62.     According to the Proxy, certain of the directors and officers "have interests in the merger that are different from, and in addition to" PPDI public shareholders. This is borne out in several provisions of the Merger Agreement providing for accelerated payment for all vested and unvested stock options, restricted shares, restricted stock units ("RSUs"), deferred shares, "golden parachute" compensation, and change-in-control severance payments owned by all directors and officers, providing for immediate cash opportunities for illiquid holdings that the Individual Defendants could not otherwise exercise until some date well into the future.

63.     For example, according to the Proxy, defendant Eshelman is set to receive a total of approximately *$19.1* million accelerated payment from vested and unvested stock options, RSUs, vested deferred shares and golden parachute compensation. Notably, 210,760 of these shares were *unvested* stock options that, if not for the Proposed Transaction, were illiquid holdings that Eshelman could not exercise until some date well into the future. Eshelman has an additional 30,000 RSUs, with an aggregate value of $997,500. All told, Eshelman beneficially owns 8,244,506 shares of PPDI stock (equating to 7.3% of the Company's outstanding shares), providing for an enormous *$274,129,824.5* payment. Thus, accounting for acceleration of otherwise illiquid blocks of options, RSUs, etc., and Eshelman's outstanding equity interest in the Company, Eshelman is set to immediately receive approximately *$293,229,824.5* that he would not have otherwise received until some unknown date in the future, should the Proposed Transaction come to fruition.

64.     Similarly, Defendant McNeil also stands to receive big payout. At the sale price, his 3 million-plus shares are worth about *$105 million*.

65.     In addition, Eshelman and his co-executives' "change in control severance agreement" payments are, to put it mildly, extravagant.  If the employment of any of PPDI's senior executive officers, including Eshelman, terminates (for essentially any reason) within one year of the Proposed Transaction's close, they will receive a severance payment equal to a factor times the sum of (i) the executive officer's base salary for the 12-month period prior to termination of employment plus (ii) the greater of (A) the executive officer's target incentive award under the Company's incentive compensation plan in effect immediately prior to termination of employment or (B) the average of the cash awards received by the executive officer in the two successive 12-month periods immediately prior to termination of employment. Defendant Eshelman, with a current base salary of $740,000, is entitled to a severance payment equal to three times the severance amount.

66.     Worse still, the Buyout Group anticipates that certain executive officers and key employees of the Company will be offered the opportunity to invest some or all of the proceeds they receive in the merger with respect to their currently owned equity (including stock options and restricted stock) of the Company (because all such equity will be immediately accelerated and cashed-out in connection with the Merger) for shares of Parent common stock.  Thus, senior management potentially has the opportunity to use the lavish proceeds from the Proposed Transaction to further enrich themselves with equity stakes in the Parent going forward, opportunities Plaintiff and the Class were illegally deprived.

67.     Contributing to the crippling conflicts of interest, in the Proposed Transaction, PPDI was represented by investment advisors Morgan Stanley and Lazard.  However, there is an inherent conflict in that Morgan Stanley frequently partners with the Buyout Group on lucrative

deals, including, for example, the acquisition of Manor Care, Inc. by The Carlyle Group in 2007 where Morgan Stanley acted as a financial advisor for The Carlyle Group.

**E.      Preclusive Deal Protection Devices**

68.      Despite an opportunity for a robust process to engage multiple bidders in a sale of the Company, the Individual Defendants favored the Buyout Group and did not conduct an auction or reliable market check to solicit other likely potential bidders.

69.      Rather, the Individual Defendants agreed to an inadequate 30-day "go-shop" period whereby, having already committed to the Proposed Transaction at $33.25 per share and a potential termination fee in excess of $58 million to the Buyout Group (representing 1.6% of the equity value of the Proposed Transaction), the Individual Defendants would proceed during the next 30 days to solicit other interest in the Company.  However, any other interested parties would effectively have to pay the termination fee to the Buyout Group and be faced with the Buyout Group's matching rights for any competing bid, all of which is designed to repel any real competition to the Proposed Transaction.

70.      Specifically, according to the terms of the Merger Agreement, during the period from October 3, 2011 and continuing until 11:59 p.m. on November 3, 2011 (the "Go-Shop Period") the Company may solicit alternative acquisition proposals.  During that time period, the Company may terminate the Merger Agreement if the Company receives a takeover proposal that the Board determines in good faith constitutes a "Superior Proposal."  Under these circumstances, a termination fee of $58 million would be payable to the Buyout Group.

71.      Moreover, even if PPDI receives a "Superior Proposal" from a third party, the Company is obligated under Section 6.2 of the Merger Agreement, within 24 hours thereafter, to make available to the Buyout Group any material non-public information concerning the

Company or its Subsidiaries that the Company provides to any person given such access that was not previously made available to the Buyout Group to avoid having the Company accept the "Superior Proposal."

72. Further ensuring that the transaction is locked up in favor of the Buyout Group is the fact, that the Buyout Group now has unfettered access to all of PPDI's books and records pursuant to Section 6.6 of the Merger Agreement with only limited exclusions, a right not shared by other potentially-interested parties. Even the Individual Defendants in their own Proxy concede that their deal protection devices might have discouraged third parties from submitting a competing acquisition proposal.

73. By agreeing to the Proposed Transaction, the Individual Defendants have initiated a process to sell the Company, which imposes heightened fiduciary responsibilities on them and requires enhanced scrutiny by the Court. The Individual Defendants owe fundamental fiduciary obligations to the Company's shareholders to take all necessary and appropriate steps to maximize the value of their shares in implementing such a transaction. In addition, the Individual Defendants have the responsibility to act independently so that the interests of PPDI's shareholders will be protected, and to conduct fair and active bidding procedures or other mechanisms for checking the market to assure that the highest possible price is achieved.

74. PPDI represents a highly attractive acquisition candidate in light of its prospects for future growth in the CRO sector and earnings potential, however the Proposed Transaction caps the PPDI shareholders' growth potential at an unfair and undervalued amount to the detriment of the Class. The preferential treatment accorded to the Buyout Group also deprived and will continue to deprive PPDI's shareholders of any substantial premium which only unfettered and even-handed exposure of the Company to the market could produce.

**F.     The Materially Misleading And/Or Incomplete Proxy**

75.     In order to secure shareholder approval of this unfair deal, Defendants filed with the SEC a materially misleading and incomplete Proxy.  The Proxy is one of the first steps by Defendants to condition PPDI shareholders to approve the Proposed Transaction.  The Proxy recommends that PPDI shareholders vote in favor of the Proposed Transaction when the shareholder vote is eventually scheduled, but omits and/or misrepresents material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company as well as financial analysis performed by Morgan Stanley.  Specifically, the Proxy omits and/or misrepresents the material information set forth below in contravention of Sections 14(a) and 20(a) of the Exchange Act.

76.     The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether to vote their shares in support of the Proposed Transaction.

77.     This omitted information, if and when disclosed, would significantly alter the totality of information available for consideration by the average PPDI shareholders.  As such, if PPDI shareholders are asked to eventually vote based upon these inadequate disclosures they will be irreparably harmed.

78.     For example, and in addition to the non-disclosures discussed in Section B above, the Proxy fails to disclose whether the Board undertook any actions to investigate or protect the sales process against any conflicts of interest that stemmed from Morgan Stanley's close professional relationship with The Carlyle Group, or whether the Board even considered the

possibility that any conflicts even existed. Similarly, the Proxy does not disclose the nature of Morgan Stanley's compensation structure for the services performed for the Company.

79.     Additionally, the Proxy fails to disclose sufficient information regarding the Company's threshold negotiation criteria to be employed resulting in the refusals to engage in negotiations with competitors in the Company's industry as potential acquisition partners, even if those parties could have yielded a higher offer price than the Buyout Group.

80.     On July 28, 2011, the Board held a meeting in which the Morgan Stanley representatives presented preliminary views on the value of the Company on a stand-alone public company basis, as well as value creation alternatives, including a leveraged recapitalization or similar transaction while remaining an independent public company, and the potential costs and risks associated with the alternatives discussed in view of market developments and conditions. The Proxy indicates that during the meeting, the Morgan Stanley representatives, the Company's management and the board of directors discussed these alternatives and potential financing costs and debt capacity in light of recent trends in the CRO industry and the economy generally, as well as potential execution risks inherent in implementing the alternatives. However, the Proxy fails to disclose any details regarding the contents of those discussions, or any material information to help illustrate to PPDI shareholders why the Board felt compelled to seek an acquisition as opposed to alternative stand-alone strategies. Such information is critical for PPDI shareholders to make an informed decision when they are required to vote on the Proposed Transaction.

81.     Further, and critically, the Proxy never adequately discloses why the Company ultimately agreed to such an inadequate price as merger consideration, particularly considering that the early indications of interest and preliminary offers were in the range of $36 – $38. In

fact, according to the Proxy, one of the factors the Board considered which weighed against entering into the Merger Agreement was the fact that the price of $33.25 **is lower than** the range of values calculated by each of Morgan Stanley and Lazard using a discounted cash flow of the management case projections. However, the Proxy never adequately discloses how the Board could justify such an offer in light of this fact.

82. Moreover, the Proxy fails to disclose all of the underlying methodologies, projections, key inputs and multiples relied upon and observed by Morgan Stanley and Lazard in connection with the Proposed Transaction, which are necessary for shareholders to evaluate and properly assess the credibility of the various analyses performed by Morgan Stanley and Lazard relied upon by the Board in recommending the Proposed Transaction. In particular, the Proxy is deficient and should provide, *inter alia*, the following:

(1) In the *Selected Precedent Transactions Analysis* performed by Morgan Stanley, the bank applied last twelve month ("LTM") *Earnings Before Interest, Taxes, Depreciation and Amortization* (EBITDA") multiples (a specialized metric used to analyze and compare profitability between companies and industries) ranging from 9.0x to 12.0x to the Company's EBITDA for the twelve-month period ending **September 30, 2011** and derived a reference range of implied equity value per share of the Company common stock of $29.00 to $36.75. However, because the Company **did not release** earnings figures for the third quarter 2011, Morgan Stanley's analysis is based on non-public information. The Proxy fails to disclose whether the $33.25 price, as negotiated, was based on June 30, 2011 financials for PPDI or September 30, 2011 non-public financials.

(2) Also in the *Selected Precedent Transactions Analysis* performed by Morgan Stanley, the bank applied a premium to **implied unaffected market price** per share of common stock ranging from 25.0% to 40.0% and derived a reference range of implied equity value per share of the Company's common stock of $26.25 to $29.50. Morgan Stanley derived the implied unaffected market price by applying the stock price performance of Covance Inc. from July 15 to September 30, 2011 to the Company's stock price on July 15, 2011. However, the Proxy fails to disclose whether Morgan Stanley performed any analysis to justify applying PPDI's July 15 price to Covance Inc.'s subsequent performance through September 30 to calculate the implied unaffected trading price in this instance, in which Morgan Stanley used a price of $21.03. If the analysis applied the

unaffected trading price conventionally, *i.e.* to PPDI's actual unaffected stock price on July 15 ($27.86), the implied fair value would be ***$34.825 - $39.00***.

(3)    In the *Selected Precedent Transactions Analysis* performed by Lazard, the bank failed to disclose the multiples observed for each of the selected transactions. This data is particularly relevant since Lazard arrived at higher mean/median EV/LTM EBITDA multiples than Morgan Stanley (12.8x – 14.2x as compared to 11.1x – 10.8x). Additionally, Lazard, like Morgan Stanley, applied EV/LTM EBITDA multiples ranging from 10.0x to 14.0x to the Company's EBITDA for the twelve-month period ending ***September 30, 2011***, financial data that has not been publicly disclosed. The Proxy fails to disclose whether the $33.25 price, as negotiated, was based on June 30, 2011 financials for PPDI or September 30, 2011 non-public financials.

(4)    In the *Premia Paid Analysis*, Lazard applied the premium reference range of 25.0% to 50.0% to an ***implied unaffected price*** of $20.37, which is the product of (x) the unaffected price and (y) the sum of one plus the market-cap weighted average of the change in closing stock prices of the selected companies under Lazard's "Selected Companies Analysis" from July 15, 2011 to September 30, 2011, and derived a reference range of implied equity values per share of the Company's common stock of $25.46 to $30.55. Like the analysis for Morgan Stanley, the Proxy fails to disclose whether Lazard performed any analysis to justify applying a market-cap weighted average to PPDI's July 15 price to calculate the implied unaffected trading price in this instance, which yielded a much lower reference range of implied equity values per share than had Lazard utilized the actual July 15 unaffected price of $27.86 (which yields a reference range of $34.83 - $41.79).

83.    The information requested above collectively amounts to the key inputs necessary for one to be able to evaluate and understand the sales process and analysis rendered in connection with the Proposed Transaction. Therefore, the aforementioned omitted information is highly relevant and material to PPDI shareholders.

## COUNT I

### On Behalf of Plaintiff for Violations of Section
### 14(a) of the Exchange Act
### (Against PPDI and the Individual Defendants)

84.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

85.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

86.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.

87.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

88.    Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

89.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT II

### On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

90.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

91.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

92.     The Individual Defendants acted as controlling persons of PPDI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of PPDI, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

93.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of this document.

95.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

96.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

97.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

98.     Plaintiff has no adequate remedy at law.

## COUNT III

**On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

99.     Plaintiff repeats and realleges each and every allegation set forth herein.

100.    The Individual Defendants have violated their fiduciary duties owed to the public shareholders of PPDI and have acted to put their personal interests ahead of the interests of PPDI shareholders or acquiesced in those actions by fellow defendants.  These Individual Defendants have failed to take adequate measures to ensure that the interests of PPDI's shareholders are properly protected and have embarked on a process that avoids competitive bidding and provides the Buyout Group with an unfair advantage by effectively excluding other alternative proposals.

101.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, will unfairly deprive Plaintiff and other members of the Class of the true value of their PPDI investment.  Plaintiff and other members of the Class will suffer irreparable harm unless the actions of the Individual Defendants are enjoined and a fair process is substituted.

102.     The Individual Defendants have breached their duties of loyalty, entire fairness, good faith, and care by not taking adequate measures to ensure that the interests of PPDI's public shareholders are properly protected from over-reaching by the Buyout Group.

103.     Moreover, the Individual Defendants have failed to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding the Proposed Transaction.

104.     By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

105.     As a result of the actions of Defendants, Plaintiff and the Class have been, and will be, irreparably harmed in that they have not, and will not, receive their fair portion of the value of PPDI's stock and businesses, and will be prevented from obtaining a fair price for their common stock.

106.     Unless enjoined by this Court, the Individual Defendants will continue to breach the fiduciary duties owed to Plaintiff and the Class and may consummate the Proposed Transaction to the disadvantage of the public shareholders.

107.     The Individual Defendants have engaged in self-dealing, have not acted in good faith, and have breached, and are breaching, fiduciary duties owed to Plaintiff and the other members of the Class.

108.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which these actions threaten to inflict.

## COUNT IV

### On Behalf of Plaintiff and the Class for Aiding and
### Abetting the Individual Defendants' Breaches of Fiduciary Duty
### (Against PPDI and the Buyout  Group)

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    PPDI and the Buyout Group have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to PPDI's public shareholders, and have participated in such breaches of fiduciary duties.

111.    PPDI and the Buyout Group knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, PPDI and the Buyout Group rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

112.    Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in favor of the Class, and against the defendants as follows:

A.    Certifying this case as a class action, certifying Plaintiff as class representative and his counsel as class counsel;

B.    Declaring that the conduct of the Individual Defendants in approving the Proposed Transaction and failing to negotiate in good faith with potential acquirors other than the Buyout Group and other acts and omissions set forth herein are breaches of the Individual Defendants' fiduciary duties;

**C.** Preliminarily and permanently enjoining the Individual Defendants and all persons acting in concert with them from taking any steps to consummate the Proposed Transaction on the terms presently proposed;

**D.** Preliminarily and permanently enjoining the Individual Defendants from initiating any defensive measures that would inhibit the Individual Defendants' ability to maximize value for PPDI shareholders;

**E.** To the extent the Proposed Transaction is consummated prior to this Court's entry of a final judgment, rescinding it and setting it aside or awarding rescissory damages;

**F.** Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered by them as a result of defendants' wrongful conduct alleged herein;

**G.** Awarding Plaintiff the costs, expenses, and disbursements of this action, including attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

**H.** Awarding Plaintiff and the Class such other relief as this Court deems just, equitable, and proper.

Dated: October 18, 2011

/s/ Shane T. Rowley_____
Shane T. Rowley
**Attorney for Plaintiff**
**FARUQI & FARUQI, LLP**
369 Lexington Ave., 10th Floor
New York, NY 10017
srowley@faruqilaw.com
Tel: 212-983-9330
Fax: 212-983-9331
New York State Bar No.: SR0740
**OF COUNSEL**


/s/ William E. Moore Jr._____
William E. Moore, Jr.
**Attorney for Plaintiff**
**Gray, Layton, Kersh, Solomon,**
**Furr & Smith, P.A.**
516 South New Hope Road
P.O. Box 2636
Gastonia, North Carolina 28053-2636
bmoore@gastonlegal.com
Tel:  704-865-4400
North Carolina Bar No. 9962
**Local Civil Rule 83.1 Counsel**